ESTATE OF WOODROW COLLEY, DECEASED, GLADYS COLLEY, INDEPENDENT EXECUTRIX, GLADYS COLLEY, WOODROW COLLEY LUMBER CO., INC., AND COLLEY WHOLESALE LUMBER CO., INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF WOODROW COLLEY, DECEASED, GLADYS COLLEY, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Colley v. Commissioner
Docket Nos. 3838-77, 9020-78.
United States Tax Court
T.C. Memo 1980-107; 1980 Tax Ct. Memo LEXIS 481; 40 T.C.M. (CCH) 81; T.C.M. (RIA) 80107; April 2, 1980, Filed John L. Bates, for the petitioners. Gary A. Benford and Frank C. Hider, Jr., for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases respondent determined the following deficiencies in petitioners' Federal income taxes in Docket No. 3838-77: Petitioners
Taxable Years Ended
Deficiency
Estate of Woodrow Colley,
12/31/71
$215,993.20
Deceased, Gladys Colley,
Independent Executrix, and
Mrs. Gladys Colley,
Surviving Wife
Estate of Woodrow Colley,
12/31/70
791.37
Deceased, Gladys Colley,
Independent Executrix, and
[1] Mrs. Robbie Colley Woodrow Colley Lumber Co.,
9/30/68
8,761.32
Inc.
9/30/70
448.46
Colley Wholesale Lumber
9/30/70
228.31
Co., Inc.
9/30/71
10,113.29
*483 Respondent has also determined in Docket No. 9020-78 a deficiency in federal estate tax against the Estate of Woodrow Colley, Deceased, Mrs. Gladys Colley, Executrix, in the amount of $56,312.81. After concessions by both respondent and petitioners (including issues which petitioners have abandoned), the following issues remain for our decision: (1) Whether the decedent realized in 1970 and 1971 constructive dividends from Woodrow Colley Lumber Co. and Colley Wholesale Lumber Co. either through forgiveness of his indebtedness to the corporations or through certain advances by the corporations to him or on his behalf. (2) Whether the decedent realized in 1971 constructive dividends from Woodrow Colley Lumber Co. and Colley Wholesale Lumber Co. through the payment by the corporations of certain legal and accounting fees. (3) Whether Woodrow Colley Lumber Co. and Colley Wholesale Lumber Co. are entitled to deduct certain legal and accounting fees as business expenses in 1971. [2]
*484 (4) Whether the Estate of Woodrow Colley is entitled, for estate tax purposes, to a "notes payable" deduction and, if not, whether the value of Colley Wholesale Lumber Co. stock owned by the decedent at the time of his death should be reduced. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Woodrow Colley (Woodrow) died August 4, 1975, a resident of Waco, Texas. On the dates the petitions were filed in this case, Gladys Colley (Gladys) resided in Waco, Texas. Gladys is a party by virtue of having filed a joint Federal income tax return with her husband Woodrow for 1971 and by virtue of being independent executrix of his estate. Woodrow Colley Lumber Co. (Retail) and Colley Wholesale Lumber Company (Wholesale) were corporations organized under the laws of the State of Texas. Their headquarters and principal offices were in Waco, Texas, when they filed their petition herein. During the years at issue Woodrow was president of both Retail and Wholesale. Gladys was president of both corporations when their petition herein was filed. Retail and Wholesale employ the accrual *485 method of accounting and have adopted a fiscal year ending September 30. All returns at issue herein were filed with the Internal Revenue Service Center in Austin, Texas. Woodrow and his first wife, Robbie Colley (Robbie) began Colley Lumber in the 1940's. The business grew from this beginning and sometime in the 1950's was incorporated into two separate entities, Retail and Wholesale. At least up until July 26, 1971, Woodrow was the sole shareholder of both of these corporations. During these years both Colleys took an active role in the business; Robbie kept the books and payroll records, and Woodrow generally acted as manager. By the 1970's, Retail was involved primarily in the construction and home sales business. Woodrow had other financial interests as well, including a one-half interest in The Scotchman, Inc. (a package store business) and a half interest in Power & Colley, a partnership. Additionally, on January 19, 1970, Woodrow, individually, entered into a contract with M.F. Enterprises, Inc. for the purchase of the Triangle Liquor Store (Triangle). The purchase price for the real property, equipment and all other assets except inventory was $120,000, $45,000 *486 of which was to be paid initially in cash. A note at 8 percent annual interest for the remaining $75,000 was to be paid in three equal annual installments. Triangle's liquor inventory was separately purchased, after proper adjustment was made for proration of taxes and insurance, for $71,025.48 cash. On January 29, 1970, Woodrow made the initial cash payment of $116,025.48 to M.F. Enterprises for the purchase of Triangle. On the same date Woodrow assigned his interest in the purchase contract to Colley Enterprises (Enterprises), a Texas corporation incorporated on January 28, 1970, for the purpose of taking title to Triangle. The minutes of the first meeting of Enterprises' board of directors indicate that 11,602 shares were issued in exchange for Woodrow's $116,025.48 payment. At Woodrow's request 11,600 shares were issued in his own name, one share was issued in the name of J.A. Thompson and one in Douthitt Lester's name.These shares constituted all of the outstanding stock of Enterprises. The board voted that $5.48 be paid to Woodrow rather than be carried on the books as capital surplus. The funds for Woodrow's January 29, 1970, payment were provided by the two lumber *487 corporations. On that date Retail issued a check in the amount of $15,000 and Wholesale issued a $101,025.48 check, both to the order of M.F. Enterprises. Retail had also written two checks to M.F. Enterprises earlier, on January 14, 1970. One of these checks was for $5,000; the other, in the amount of $10,000, was voided before it was cashed. In addition, on January 19, 1970, Wholesale issued a $10,000 check to Triangle for initial capital. Woodrow executed promissory notes on behalf of Triangle for all of these advances, including those used by Woodrow as an individual to make the initial payment to M.F. Enterprises. The notes, listed below, had no stated due date and provided for interest of 8-1/2 percent annually. Date
Number of Notes
Amount
Payable To
1/16/70
1
$ 5,000.00
Retail
1/19/70
1
10,000.00
Wholesale
1/30/70
1
15,000.00
Retail
1/30/70
10
10,000.00
Wholesale
1/30/70
1
1,025.48
Wholesale
During 1970 some repayments on these notes were made. One of the $10,000 notes of January 30 to Wholesale is marked "paid 2/5/70." On May 15, 1970, Retail deposited a $5,141.64 check from Triangle (which included $141,64 interest) and *488 marked "paid" Triangle's note of January 16, 1970. Another check from Triangle for $5,212 (of which $212 was interest) was deposited by Wholesale on July 15, 1970. Colley Enterprises also transferred $31,487.40 to Wholesale on August 4, 1970. This payment consisted of $30,000 principal and $1,487.40 interest. Three more of the $10,000 notes to Wholesale are marked "paid 8/3/70." The payment was made possible by a loan from Woodrow to Triangle of $31,000, proceeds of the redemption of a certificate of deposit. In spite of the fact that notes were executed and at least some repayments were made, these obligations do not appear as current or long-term liabilities on the July 31, 1970, balance sheet of Enterprises. However, the balance sheet does show an obligation to M.F. Enterprises of $75,000. The payment of the second installment in the purchase of Triangle was also financed by the lumber companies. By checks dated January 19, 1971, Retail paid $35,000 and Wholesale paid $46,000 to M.F. Enterprises. These payments, totaling $81,000, constituted full payment of $75,000 principal and $6,000 interest on the note. On behalf of Enterprises, Woodrow executed notes at 6 percent *489 interest to Retail and Wholesale in the amounts of the advances. In 1971 additional deposits were made in the accounts of the lumber companies by Triangle and Enterprises. On March 12, 1971, $5,000 from Enterprises was deposited to Retail's account. A $3,000 check from Triangle was deposited to Retail's account on March 26. Before the end of September 1971, Retail forgave the remaining $27,000 on Triangle's $35,000 note to Retail. Similarly, after crediting $600 in car payments made by Triangle for Wholesale, Wholesale forgave $45,400 of Triangle's obligation of $46,000. Sometime in late 1970 Woodrow contacted attorney Mike Beard about obtaining a divorce from Robbie Colley, and on March 16, 1971, Mr. Beard filed a divorce petition on Woodrow's behalf. In an answer and cross-action prepared by her attorney Lance Corsbie, Robbie alleged that a large amount of community property had been accumulated during the marriage and that she did not know the exact nature and extent of that property. The court ordered Woodrow to pay $1,000 per month as support to Robbie, beginning April 1, 1971.Pursuant to her request, the court also ordered Woodrow to submit a sworn inventory and *490 appraisal of all property in his possession or control. However, Mr. Beard encountered some difficulty in determining exactly what Woodrow and Robbie and each of the various corporations owned. There were many parcels of real estate without clear records as to ownership. Finally, on May 7, 1971, Woodrow filed his inventory and appraisal. Robbie and her attorney were not wholly satisfied with this response, and both parties and their attorneys agreed to have Jack Boling, a certified public accountant, prepare audit reports on each of the corporations and on the individual assets of Woodrow and Robbie. Mr. Beard and Mr. Boling spent numerous hours reconstructing the records of the corporations, even going so far as to redraft bylaws and to travel to the state capital to obtain copies of the corporate charters. After the assets of the corporate entities and individuals were ascertained, Mr. Beard and Mr. Corsbie negotiated a property division. Their purpose was simply to divide the assets, whether owned by the corporations or by Woodrow individually, as equally as possible, without regard for the separate entities of the corporations. The proposed property settlement was signed *491 by Woodrow only and filed, together with a copy of Mr. Boling's audit report and cover letter, with the divorce court in July 1971. On July 26, 1971, the court entered a divorce judgment which only slightly modified the proposed property settlement. Among those assets determined to be community property was the stock of Wholesale and Retail. The judgment provided that Woodrow take as his separate property all the stock in Wholesale and Retail, the interests in The Scotchman, Inc. and the Powers and Colley partnership, and certain personal effects, notes receivable and insurance policies. Robbie Colley received the family home and specified other real property, an automobile, certain savings account deposits, and all of Woodrow's stock in Colley Enterprises. Woodrow also agreed to hold Robbie harmless for certain corporate and individual accounts payable. The decree further provided as follows: IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Robbie Lee Colley do have and recover of and from Woodrow Colley the sum of $300,000.00 as her separate property and estate, and Court finds that $150,000.00 of this amount has been paid to Defendant and the balance of $150,000.00 has been *492 paid to Defendant, Robbie Lee Colley, by Plaintiff, Woodrow Colley, by note of even date payable in monthly installments and secured by a pledge of all the stock of the Woodrow Colley Lumber Co., Inc., which stock has been placed in trust with and payments to be made through the First National Bank of Waco, Texas. The lumber companies made many payments on Woodrow's behalf in connection with the divorce. Retail issued thousand dollar support checks to Robbie on April 9, May 7, May 11 and June 4, 1971. A check of June 8, 1971, for $4,000 on Wholesale's account payable to Woodrow was used by him to make additional support payments to Robbie. Wholesale made two payments of $1,629 to Robbie's trust at the First National Bank, one dated August 26 and another dated September 27, 1971. The automobile which went to Robbie was owned by Wholesale and carried on the books at a value of $7,997.55. In addition, Wholesale issued a check dated August 23, 1971, to Robbie Colley and Corsbie in the amount of $5,711.90. Finally, the initial $150,000 cash payment was also provided by the corporations. Retail issued a $5,000 check to Robbie and her attorney on July 23, 1971. On that same day *493 Wholesale issued a check to them for the remaining $145,000; of that amount Wholesale had borrowed $50,000 from the First National Bank of Waco. An undated invoice for attorney's fees charged by Mr. Beard for legal services provided to Woodrow shows the following: Attorney's fees (divorce)
$ 1,500.00
Attorney's fees (preservation
23,500.00
of estate)
Colley Enterprises
$ 3,000.00
Woodrow Colley Lumber Co.
6,380.00
Woodrow Colley Wholesale
14,120.00
Lumber Company
Total
$25,000.00
Mr. Beard allocated the bulk of the charges to the corporations because he spent a great deal of time determining exactly what their assets were and bringing their records up to date. Woodrow originally paid Beard $500 cash in March 1971. Wholesale paid $14,500 of the fees in 1971 and $5,500 in 1972. Triangle later reimbursed Wholesale for $3,000 of these fees. Payments to Beard of $2,500 in 1971 and $2,000 in 1972 were made by Retail. On October 29, 1971, Woodrow executed two promissory notes for $1,000 each payable to Retail with six percent interest due "for attorney fees to Mike Beard." Of the $17,000 in fees paid Beard in 1971, $15,000 ($14,500 by Wholesale *494 and $500 by Retail) was paid before July 26, 1971. Jack Boling billed Woodrow $7,350 for preparation of audit reports of both corporations and Woodrow and Robbie, and for consultations with attorneys. He also billed Woodrow $750 for preparing and posting transactions of Wholesale and Retail from October 1970 through June 10, 1971. In a cover letter accompanying the audit reports, Mr. Boling stated as follows: The terms of our engagement was the preparation of these reports for the purpose of determining the value of the community estate for negotiation and division of property for the pending divorce action in the local court. Wholesale paid Mr. Boling this total fee of $8,100 by a check for $1,000 on June 28, 1971, and a check for $7,100 on July 14, 1971. On their Federal income tax returns for the taxable year ended September 30, 1971, Wholesale and Retail claimed deductions for accrued legal and accounting expenses in the amounts of $20,804 and $9,808.50, respectively. The original employment contract between Robbie and her attorney Mr. Corsbie provided for a fee equal to $1,000 plus 20 percent of her claim against Woodrow. When it became clear that Robbie's claim *495 was worth approximately $600,000, the contract was orally modified and the fee reduced to $51,000. In a letter to Mr. Boling, Mr. Corsbie allocated $1,000 of this amount to the divorce and $50,000 to the preservation and protection of Robbie's separate property. Over the years Woodrow frequently advanced money to the corporations, and these advances were often marked by the execution of notes to Woodrow. By 1961 Wholesale and Retail were indebted to Woodrow in substantial amounts, and in order to improve the appearance of the corporations' balance sheets, a portion of the notes payable to Woodrow was cancelled and the amounts of those notes were transferred to paid-in surplus. This transfer resulted in an increase of $28,980.90 in paid-in surplus for Wholesale and $190,037.91 for Retail. Woodrow continued to make advances, and as of September 30, 1970, the total of Wholesale's notes payable to him was $19,645.83. In his other business dealings Woodrow did not always pay strict attention to the separate existence of his corporations. Wholesale and Retail customarily provided funds to Woodrow and made payments on his behalf frequently without notes' being executed. (In fact, *496 Woodrow did not have a checking account of his own.) After September 30, 1970, such advances were generally entered on the corporations' books as "accounts receivable-officers." These transactions included cash advances to Woodrow and to Robbie on Woodrow's behalf, withdrawals by Woodrow from collateral accounts of Retail, and payment by Retail of Woodrow's property taxes. Certain miscellaneous bookkeeping adjustments (for amounts due the corporations which should have been collected by Woodrow but were not deposited to corporate accounts, for example) were also charged to the "accounts receivable-officers" account. In addition to the payments described above in connection with the purchase of Triangle and the divorce, Retail made the following payments and bookkeeping entries on Woodrow's behalf in the period from October 1, 1970, through September 30, 1971: Cash advance
$ 500.00
Withdrawal from collateral accounts
6,142.56
Adjustment related to checking account
903.93
Adjustment related to bank deposits
462.19
Woodrow's property taxes
230.28
Adjustment for undeposited amounts
collected by Woodrow
12,169.93
Robbie Colley bad debt *
12,911.26
*497 From time to time Woodrow made contributions to Wholesale and Retail for which notes were not made. As of September 30, 1970, Woodrow had made such unreimbursed advances to Wholesale totaling $13,280.43. During August 1971 Woodrow returned to Wholesale uncashed payroll checks payable to him in the total amount of $22,916.31. This sum was credited to him on Wholesale's "accounts receivable-officers" account. In 1972 Woodrow and Gladys made an additional contribution to Wholesale of $25,500, though it is not clear whether or not notes were executed for this contribution. In addition, the following adjustments entered as credits on Retail's "accounts receivable-officers" account during the fiscal year ended September 30, 1971, should be treated as contributions by Woodrow to Retail: Sales register coverage
$ 414.86
Consolidated accounts and stock draw *
14,321.30
Robbie Colley *
537.16
Sometime after September 30, 1971, Woodrow's accountant, based on the entries above, computed fiscal year-end balances in the "accounts receivable-officers" accounts of Wholesale and *498 Retail. In his computations the accountant also took into consideration all the transactions (in both 1970 and 1971) discussed above in connection with the Triangle purchase, including the repayments by Triangle and Enterprises of portions of the advances made by Wholesale and Retail. In addition, he included all corporate payments connected with the divorce except for certain of the legal fees. The resulting debit balances were $69,046.83 in the case of Retail and $254,264.62 in the case of Wholesale. The Wholesale "accounts receivable-officers" balance was then reduced to $192,357.46 by crediting amounts from other accounts--$19,645.83, the balance of notes payable by Wholesale to Woodrow; $13,280.43, the balance of Woodrow's unreimbursed advances to Wholesale; and $28,980.90, the paid-in surplus balance. In the case of Retail, the entire $69,046.83 debit balance in the "accounts receivable-officers" account was offset by a portion of the $284,751.92 paid-in surplus. All of these adjustments were indicated on the balance sheets accompanying the corporations' Federal income tax returns for the taxable years ended September 30, 1970 and 1971. These adjustments appear in the following *499 table: WHOLESALE
September 30,
September 30,
1970
1971
Assets
Loans to Woodrow
0
$192,357.46
Liabilities and equity
Accounts payable to Woodrow
$ 13,280.43
0
Notes payable to Woodrow
19,645.83
300.92 *
Paid-in surplus
28,980.90
0
RETAIL
Assets
Loans to Woodrow
0
0
Liabilities and equity
Paid-in surplus
284,751.92
215,705.09
Corporate funds were used to pay Woodrow's personal obligations in the years following September 1971. Through the fiscal years ending in 1972 and 1973, Wholesale continued to make monthly payments of $1,629 ($19,548 annually) to Robbie's trust in partial satisfaction of Woodrow's obligation under the divorce decree. Wholesale made additional payments of $7,500 and $2,100, respectively, in each of these years, and Retail paid $66,000 in the year ended September 30, 1973, on Woodrow's obligation to Robbie. These corporate payments are reflected on the financial statements of Wholesale and Retail as increases in the balances of the "accounts *500 receivable-officers" or "loans to officers" accounts as follows: "Accounts Receivable-Officers" Balances
Year Ended
September 30
Wholesale
Retail
Total
1971
$192,357.46
0
$192,357.46
1972
Unavailable
Unavailable
217,994.57
1973
216,277.09
$ 94,388.19
310,665.28
1974
219,306.09
119,324.46
338,630.55
1975
219,306.09
119,324.46
338,630.55
1976
219,306.00
119,324.00
338,630.00
1977
215,306.00
119,324.00
334,630.00
The record does not provide a basis for detailed findings as to all the payments which gave rise to the increasing loan balances. Wholesale's consolidated [3] balance sheets reveal the following assets (at book value), liabilities, and equity: Assets
9-30-75
9-30-74
9-30-73
Current
$330,243.96
$ 449,254.79
$ 378,361.68
Property, Plant &
Equipment
71,145.79
85,094.59
94,024.87
Other *
576,289.85
590,650.43
584,949.05
Total Assets
$977,679.60
$1,124,999.81
$1,057,335.60
Liabilities
Current
$101,202.43
$ 267,529.38
$ 177,736.22
Long Term
13,572.63
4,717.86
27,950.48
Other
34,131.86
34,372.70
37,030.35
Total Liabilities
$148,906.92
$ 306,619.94
$ 242,717.05
Stockholder's Equity
Capital Stock
$ 5,000.00
$ 5,000.00
$ 5,000.00
Paid-In Capital
456,735.94
456,735.94
456,735.94
Retained Earnings
367,036.74
356,643.93
352,882.61
Total Equity
$828,772.68
$ 818,379.87
$ 814,618.55
Total Liabilities &
Equity
$977,679.60
$1,124,999.81
$1,057,335.60
*501 On September 30, 1975, the assets of Wholesale had the following market values: Current Assets
$330,243.96
Property, Plant & Equipment
85,850.00
Other Assets *
514,657.02
Total Assets
$930,750.98
Less Liabilities
148,906.92
Net Tangible Worth
$781,844.06
Based upon these market values of Wholesale's assets, the book value of each share of Wholesale stock on September 30, 1975, was $1,563.69. If the "Loans to Officers" amount is excluded from the asset total, the book value comes to $886.43 per share. Wholesale's consolidated pre-tax earnings, adjusted for certain bad debt losses, were as follows: Year Ended
Amount
1975
$ 4,367.14
1974
89,935.50
1973
69,658.95
1972
(5,907.68)
1971
115,186.96
In 1974 and early 1975 a series of calamitous events occurred which seriously weakened the businesses of Wholesale and Retail. In April 1974 a major fire occurred in a warehouse of the lumber companies, which suffered a loss in the neighborhood of $50,000. The loss was not *502 compensated for by insurance. The businesses also incurred damages from a flood in October 1974. Once again damages of approximately $50,000 were not covered by insurance. Also in 1974, two major customers of the lumber companies went bankrupt.Finally, Woodrow became ill in November 1974 and after January 1975 spent very little time working for Wholesale and Retail.
No formal dividends have ever been paid by Wholesale or Retail in any of the years relevant to this case. Enterprises paid no dividends in the period from its incorporation through July 26, 1971. As of September 30, 1969, Wholesale had retained earnings of $210,318.06. Retail's retained earnings, without adjustment for the 1968 tax deficiency determined by respondent, were $240,299.73 on September 30, 1969. On the Federal estate tax return filed after Woodrow's death, the value of Woodrow's 100 percent interest in Wholesale is reported as $425,000, or $850 per share. In this valuation Retail is included as a subsidiary of Wholesale, and $338,630.55 in loans to Woodrow is included as an asset. The amount of $338,631 is also deducted on the Federal estate tax return as a debt, mortgage, or lien of the decedent.
*503 OPINION On brief respondent contends that Woodrow, as sole stockholder of Wholesale and Retail, realized constructive dividends in 1971 when paid-in surplus in the amounts of $28,980.90 and $69,046.83 was transferred to cancel "accounts receivable-officers." In the alternative respondent contends that constructive dividends in these amounts were realized when Wholesale and Retail made specific advances on Woodrow's behalf. Secondly, respondent argues that Woodrow realized additional constructive dividends of $189,056.54. He contends that this is the net increase in Wholesale's "accounts receivable-officers" account and reflects amounts advanced to or on behalf of Woodrow in 1971. As an alternative to this second contention respondent asserts that if the net debits in the "accounts receivable-officers" accounts attributable to the Triangle purchase transactions are not constructive dividends, then Woodrow realized a constructive dividend when the original purchase money was advanced in 1970 and when his $75,000 obligation was paid in 1971. This alternative theory of respondent was first raised in his amendment to answer which was filed with leave of the Court. Thirdly, *504 respondent takes the position that the payment in 1971 by Wholesale and Retail of legal and accounting fees associated with Woodrow's divorce constitute constructive dividends in that year. (These payments were not recorded on the "accounts receivable-officers" accounts.) Respondent also contends that Wholesale and Retail are not entitled to deductions for such fees in the amounts of $20,058 and $8,692 respectively, and that if the fees are business expenditures, they must be capitalized. Finally, it is the contention of respondent that the "notes payable" by Woodrow to the corporations were not valid or legitimate obligations of Woodrow and that his estate is not entitled to a "notes payable" deduction of $338,631. Petitioners contend that none of the advances and distributions were constructive dividends. They assert that some of the amounts were necessary to effect an equal division of property and that all advances were bona fide business loans represented by interest bearing notes. Petitioners also take the position that the legal and accounting fees at issue, though related to the divorce, were ordinary and necessary business expenses of the corporation. Finally, petitioners *505 contend that the estate did have a valid obligation to the corporations in the amount of $338,631 and further, in the event that we find against them on this issue, the value of Woodrow's gross estate should be reduced. I. Constructive Dividends
We will deal first with those advances made on Woodrow's behalf in connection with the purchase of the Triangle Liquor Store. A brief summary of the facts will aid in understanding our discussion. On January 19, 1970, Woodrow entered into a purchase contract under which he was obligated to pay $166,025.48 in cash and to present his note for an additional $75,000. This cash obligation was satisfied by Wholesale and Retail, who on January 29, 1970, provided checks to M.F. Enterprises, the seller, totaling $116,025.48. Woodrow transferred his interest in the purchase contract to Colley Enterprises, which issued 11,602 shares of stock in exchange for his payment of the $116,025.48. Enterprises also executed notes to Wholesale and Retail to cover the amounts of the payments to the seller. It is a settled principle of law that a payment made by a corporation in satisfaction of a personal obligation of a shareholder may constitute *506 a constructive dividend to the extent of corporate earnings and profits. Smith v. Commissioner, 70 T.C. 651, 668 (1978); American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1115 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). Although the exact nature of the legal relationships created by these particular transactions may not be obvious at first glance, after careful consideration we conclude that the checks to M.F. Enterprises--$15,000 from Retail and $101,025.48 from Wholesale--constituted distributions to Woodrow taxable as dividends to the extent of the respective corporations' earnings and profits. [4]
There can be no question that Wholesale and Retail satisfied a personal obligation of Woodrow and that Enterprises issued stock to him in recognition that such obligation, the cash portion of the purchase price, had been paid.Although Enterprises executed *507 notes to Wholesale and Retail promising to repay with interest the $116,025.48 in advances by the lumber companies, there is no evidence in the record, nor do petitioners contend, that Woodrow acted in these transactions as agent of Enterprises and not on his own behalf. The fact that 11,602 shares of Enterprises' stock were issued to him is inconsistent with an agency theory.Nor do petitioners assert that the notes executed by Enterprises represented an assumption of an obligation of Woodrow to Wholesale and Retail. [5] There is no evidence that such an obligation from Woodrow ever existed; he never personally undertook to reply the $116,025.48 in advances, either to the lumber companies or to Enterprises. We recognize that the fact that Enterprises did make some payments on the notes to Wholesale and Retail is not wholly consistent with our conclusion that the $116,025.48 from Wholesale and Retail was a distribution to Woodrow individually and not a loan to him *508 personally or as Enterprises' agent. Nevertheless, we are not persuaded that the notes ececuted by Enterprises were bona fide. They do not appear on the July 31, 1970, balance sheet of Enterprises as current or long-term liabilities, and substantial portions of the "obligations" were ultimately cancelled. (Triangle and Enterprises made actual payments of not more than $45,000 on the $116,025.48 in notes.) Nor do we think the payments by Triangle and Enterprises should be properly offset against the lumber companies' advances to determine a net amount of distributions, since the repayments were not made by Woodrow individually. Additional advances were made by Wholesale and Retail in January 1970 in connection with the Triangle purchase. Retail paid M.F. Enterprises $5,000 by a check dated January 14, 1970. The record provides no explanation of this payment, and respondent contends that it was made in satisfaction of some unspecified obligation of Woodrow. (This contention was raised in an amendment to respondent's answer.) The burden of proving that respondent's determination in incorrect remains on petitioners ( Welch v. Helvering, 290 U.S. 111 (1933); Spangler v. Commissioner, 32 T.C. 782 (1959), *509 affd. 278 F.2d 665 (4th Cir. 1960)), and they have failed to meet that burden. We find the $5,000 payment taxable as a dividend to the extent of Retail's earnings and profits. Another check dated January 14, 1970, from Retail to M.F. Enterprises for $10,000 was voided before it was cashed. We hold that this check did not benefit Woodrow and did not constitute a constructive dividend. Finally, a payment of $10,000 by Wholesale to Triangle by check dated January 19, 1970, was to provide Triangle with operating capital.This payment was to Triangle and was clearly not in satisfaction of any obligation of Woodrow. It does not constitute a constructive dividend. Petitioners contend that the statute of limitations bars consideration of any deficiency for 1970 greater than that originally determined in respondent's notice of deficiency. However, the year 1970 is presently before this Court, which has jurisdiction to redetermine the amount of a deficiency even if it exceeds that in the statutory notice. Section 6214(a). [6] Furthermore, respondent properly raised the increased deficiency for 1970 in his amendment to answer. The case upon which petitioners rely, Commissioner v. Goldstein's Estate, 340 F.2d 24 (2d Cir. 1965), *510 involves respondent's attempt to avoid the statute of limitations by reliance on sections 1311 through 1314 and is wholly inapposite here. We reject petitioners' contention and conclude that our determination on this issue is not precluded by the statute of limitations.
In connection with the purchase of the Triangle Liquor Stores, Woodrow executed a note to M.F. Enterprises for $75,000, payable in three equal annual installments. Although there is no formal evidence that Enterprises assumed this obligation of Woodrow, it does appear as a liability on Enterprises' July 31, 1970, balance sheet. However, when the first payment on the note came due in January 1971, Retail and Wholesale, paying $35,000 and $46,000 respectively, entirely satisfied the note, including interest. Enterprises executed promissory notes for these amounts and before September 30, 1971, made payments (either on its own account or through Triangle) of $8,000 to Retail. The $27,000 remaining on Enterprises' note to Retail and $45,400 on the note to Wholesale were *511 forgiven by the lumber companies before the end of September 1971. We are not persuaded that Woodrow's obligation on this $75,000 note was actually assumed by Enterprises, or that Woodrow was ever released from liability by M.F. Enterprises before the note was paid. In the light of the ultimate payment of the debt by Wholesale and Retail, the minimal repayment of the notes by Enterprises, and the subsequent forgiveness of the substantial portion of Enterprises' "debts" to Wholesale and Retail, we conclude that Woodrow continued to be personally obligated on the $75,000 note until January 19, 1971. The payments by Wholesale and Retail at that time, in satisfaction of Woodrow's personal obligation, were constructive dividends to the extent of the corporations' earnings and profits. Smith v. Commissioner, 70 T.C. 651 (1978); American Properties, Inc. v. Commissioner, 28 T.C. 1100 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). We next turn our attention to those transactions unrelated to the Triangle purchase which were represented by credits and debits on the "accounts receivable-officers" accounts of Wholesale and Retail. *512 These transactions are summarized in the table below: Accounts Receivable-Officers
Wholesale
6-8-71
Check to Woodrow--used for support payments
$ 4,000.00
7-23-71
Check to Robbie and attorney--property
settlement
145,000.00
8-71
Payroll checks voided by Woodrow
$22,916.31
8-23-71
Checks to Robbie and attorney--"after
closing collection"
5,711.90
8-26-71
Check to trust for Robbie
1,629.00
9-27-71
Check to trust for Robbie
1,629.00
*
Auto to Robbie (book value)
7,997.55
9-30-71
Transfer of "notes payable" account balance
19,645.83
9-30-71
Transfer of unreimbursed advances balance
13,280.43
Balance
$110,124.88
Retail
4-9-71
Check to Robbie--support
1,000.00
5-7-71
Check to Robbie--supporr
1,000.00
5-11-71
Check to Robbie--support
1,000.00
6-4-71
Check to Robbie--support
1,000.00
7-23-71
Check to Robbie and attorney--property
settlement
5,000.00
*
Cash withdrawal by Woodrow
500.00
*
Withdrawal by Woodrow from collateral
accounts
6,142.56
*
Adjustment related to checking account
903.93
*
Adjustment related to bank deposits
462.19
*
Payment of Woodrow's property taxes
230.28
*
Adjustment for undeposited amounts
collected by Woodrow
12,169.93
*
"Robbie Colley bad debt"
12,911.26
*
"Sales register overage"
414.86
*
"Consolidated accounts and stock draw"
14,321.30
*
"Robbie Colley"
537.16
Balance
27,046.83
*513 Petitioners contend that these advances and other adjustments were bona fide loans. Whether they were loans or dividend distributions is a question of fact to be determined upon consideration of all the surrounding facts and circumstances. The critical question is whether Woodrow intended to repay these advances at the time they were made. Dean v. Commissioner, 57 T.C. 32 (1971); Chism's Estate v. Commissioner, 322 F.2d 956 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Berthold v. Commissioner, 404 F.2d 119 (6th Cir. 1968), affg. a Memorandum Opinion of this Court. We conclude that Woodrow had no intent to repay the advances at the time they were made and that the net debit balances shown above constituted dividend distributions, to the extent they are covered by earnings and profits. Our conclusion is based on several factors. First, in spite of petitioners' allegations to the contrary, no notes were executed by Woodrow to the corporations in connection with any of the advances and bookkeeping adjustments set forth in the tables above. [7] See Alterman Foods, Inc. v. United States, 505 F.2d 873, 879 (5th Cir. 1974). *514 Nor was there any agreement for the payment of interest on these amounts. In fact, the record does not show that Woodrow ever paid interest on any of the advances. See Roschuni v. Commissioner, 29 T.C. 1193, 1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959), cert. denied 362 U.S. 988 (1960). Second, Woodrow's increasing debit balance does not indicate an intent to repay. See Baird v. Commissioner, 25 T.C. 387, 394 (1955). In years following 1971 Wholesale and Retail continued to make substantial advances on Woodrow's behalf. However, there was no schedule for repayment of any of these amounts, and in fact Woodrow made no cash repayments in 1971 at all. See Magnon v. Commissioner, 73 T.C. No. 79 (February 28, 1980). Furthermore, there is no evidence of any corporate *515 resolution or other agreement that the amounts which appear as credits on the "accounts receivable-officers" account be treated as repayments; it was the determination of the corporations' accountant that the amounts should be entered as credits on that account. (The major credit entry arose when Woodrow surrendered without cashing certain of his payroll checks from Wholesale. Other credits stemmed from accounting adjustments. See Roschuni v. Commissioner, supra.) Nor does the record indicate a subsequent history of repayments by the petitioners (other than $25,500 in 1972) which might be construed as repayments of earlier advances to Woodrow by Wholesale and Retail. In view of these continuing advances and few, if any, intentional repayments, we are unable to conclude that Woodrow had an intent to repay any of the advances when they were made. A third factor in our conclusion is the open account dealing between Woodrow and the corporations. See Alterman Foods, Inc. v. United States,supra. Woodrow was in complete control of Wholesale and Retail, and no ceiling was put on the corporations' advances to him. Nor was it likely, under the *516 circumstances, that the corporation would ever attempt to compel repayment of the advances. See Berthold v. Commissioner, 404 F.2d 119 (6th Cir. 1968), affg. a Memorandum Opinion of this Court. Fourth, it is apparent from Woodrow's actions that he did not fully understand the effect of incorporating his business. He considered corporate property to be his property. This fact is evident from the manner in which the divorce property settlement was arranged. Corsbie and Beard ignored the separate existence of the corporations in providing for the cash payments and distribution of the automobile, and instead treated these assets as assets of the shareholder. Further indication of Woodrow's failure to grasp the significance of the corporate entities is the execution by Triangle of notes to Wholesale and Retail for advances which were clearly for the benefit of Woodrow, not Triangle. Such action indicates that Woodrow did not draw a distinction between his own property and property belonging to the corporations. Thus, in Woodrow's mind, there would have been no reason for him to undertake to pay back amounts paid to him out of corporate funds. [8]
*517 Finally, the fact that neither Wholesale nor Retail has ever declared dividends, in spite of their substantial earnings and profits, is a factor weighing in favor of our conclusion. See Dean v. Commissioner, 57 T.C. 32 (1971); Haber v. Commissioner, 52 T.C. 255, 267-268 (1969), affd. 422 F.2d 198 (5th Cir. 1970). No one of these factors would be determinative on this issue. See, e.g., Pierce v. Commissioner, 61 T.C. 424 (1974). However, taken together they lead us to the conclusion that the debit balances set forth above represent constructive dividends. Alterman Foods, Inc. v. United States, supra.In short, petitioners have not carried their burden of proving that the net advances were loans and not dividends. Welch v. Helvering, 290 U.S. 111 (1933); Dean v. Commissioner, supra.
The instant case is distinguishable from Wentworth v. Commissioner, T.C. Memo. 1966-167, on which petitioners rely. In that case the Court found that net withdrawals by the shareholder-petitioners were loans and not dividends. This Court decided that the petitioners *518 had insufficient stock interests to allow them full exercise of dominion and control over corporate policies. Although there were no notes, interest payments, security of schedule for repayment of the debts, this lack of control, combined with the harm unrepaid withdrawals would have done to the corporation, led us to conclude that the shareholders intended to repay the advances when they were made. By contrast, in this case Woodrow had complete control over both Wholesale and Retail, and nothing in the record gives us reason to believe he intended to repay the advances. In determining the amounts of the constructive dividends to Woodrow, respondent has allowed the credits shown in the table above at page 33 as offsets against the corporations' advances for Woodrow. Although it is not clear that these credits must be allowed, [9] we will not disturb respondent's conciliatory determination. Respondent contends, however, that no credit should be allowed for the amounts transferred from paid-in surplus to the "accounts receivable-officers" accounts of Wholesale and Retail. *519 We agree that the amounts of advances we have determined to be distributions should n ot be reduced for transfers from paid-in surplus. Although the paid-in surplus balances had originally been transferred from notes payable which were cancelled, there is no evidence that the corporations were obligated to pay the amounts back to Woodrow after the cancellation of the notes. If distributions from paid-in surplus had been paid to Woodrow in cash, they would have been taxable ad dividends to the extent of earnings and profits. Accordingly, no credit for such transfers has been allowed. Petitioners refer to three cases-- Weaver v. Commissioner, 58 F.2d 755 (9th Cir. 1932); Jennings v. United States, 272 F.2d 842 (7th Cir. 1959); and Ortmayer v. Commissioner, 265 F.2d 848 (7th Cir. 1959)--apparently in support of their contention that crediting paid-in surplus against debit balances in the "accounts receivable-officers" accounts was proper. All three cases are distinguishable from the instant case. In Weaver shareholder contributions to a corporation were returned to the shareholders pursuant to a verbal promise to repay *520 the advances. The Court of Appeals held that there was a valid indebtedness of the corporation to the shareholders and that the repayments were not taxable as dividends. In Jennings a shareholder's loans to a corporation were transferred to paid-in surplus. However, the corporate minutes, citing Weaver, provided that the transferred amounts would be repaid when the board of directors deemed such action advisable. In the face of such strong evidence of a continuing debtor-creditor relationship, the Court of Appeals held that subsequent repayments by the corporation were not dividends. Ortmayer involved a shareholder's advances to a corporation which were referred to in corporate minutes as capital loans to be paid out of future earnings. Although originally listed on the books as "donated surplus," classification of the advances was later changed to "captial stock loans." Substantial borrowings by the shareholder from the corporation were charged against this balance. The Court of Appeals concluded that the shareholder's advances to the corporations were loans and that subsequent payments to the shareholder were loan repayments and not dividends. In each of these *521 three cases the courts found that, in spite of the classification of advances as paid-in or donated surplus, the facts indicated that each corporation continued to be obligated to repay the shareholder. However, in the instant case there are no facts on which to base a conclusion that Wholesale and Retail remained obligated to repay Woodrow after the amounts had been transferred to paid-in surplus. Petitioners contend that an equal division of community property is not a taxable transaction, citing Collins v. Commissioner, 412 F.2d 211 (10th Cir. 1969), in which the Circuit Court held that a transfer of stock made to effect a division of community property was not taxable. They argue that since many of Wholesale's and Retail's payments on Woodrow's behalf were necessitated by the property settlement, the advances cannot result in a tax to Woodrow. However, our conclusion in this case does not mean that a nontaxable division of community property of Woodrow and Robbie could not have been effected. Our theory is not that tax arose on the transfer of corporate stock owned by the community but that a distribution of corporate assets in satisfaction of a shareholder's *522 obligations resulted in dividends. Woodrow used cash and other assets of Wholesale and Retail to satisfy his obligations under the divorce decree. The holding of the Collins case is based on the fact that the wife had a co-ownership interest in the stock transferred to her. Although Robbie may have had an interest in the stock of Wholesale and Retail, she did not receive stock in these corporations but assets in which she had no specific property interest. [10]
*523 Another contention of petitioners is that the corporate distributions in connection with the property settlement had essentially the same effect as a distribution of stock to Robbie and a subsequent redemption. They assert that the transactions should be treated as a redemption for tax purposes. It is clear, however, that the transactions did not take the form of a redemption of Robbie's stock; no stock had been issued in her name. Although the two paths may lead to the same result, petitioners must accept the tax consequences of the path they choose. Reitz v. Commissioner, 61 T.C. 443, 449 (1974); Woodruff v. Commissioner, 131 F.2d 429, 430 (5th Cir. 1942). Petitioners argue that under Texas community property law Robbie was one-half owner of the Wholesale and Retail stock and that half of any dividends we determine would be taxable to her. It is true that in Texas cash dividends on stock are community property, even if the stock itself is separate property. Bakken v. Bakken, 503 S.W.2d 315, 317 (Tex. Civ. App. 1973); Tex. Fam. Code Ann. tit. 1, § 5.01 (Vernon). But this does not affect our determination with respect to *524 1970 since Woodrow and Robbie filed a joint return for that year. We also note that on July 26, 1971, Robbie no longer had a community interest in the stock of Wholesale and Retail, and no portion of dividends after that date would be taxable to her. However, before that date Wholesale and Retail each provided $4,000 for support payments, in addition to $81,000 for the Triangle purchase note and $150,000 cash in the property settlement. Although these corporate distributions were in satisfaction of obligations which were wholly Woodrow's, to the extent they are dividends they would be community property, only half of which is includable in Woodrow's income. Estate of Simmons v. Commissioner, 26 T.C. 409, 421 (1956); Hunt v. Commissioner, 22 T.C. 228 (1954); Poe v. Seaborn, 282 U.S. 101 (1930). II. Legal and Accounting Fees. On the issue of deductibility of the corporations of legal and accounting fees related to the Colleys' divorce, we apply the "origin of the claim" test set forth in United States v. Gilmore, 372 U.S. 39 (1963). [11] At issue in Gilmore was the deductibility of that part of a husband's *525 legal expense incurred in divorce proceedings which was attributable to his successful resistance of his wife's claims to certain of his assets. She asserted that earnings accumulated by the husband's three corporations were community property and that under California law she was entitled to more than a one-half interest in such property. After drawing a distinction between deductible expenses paid in carrying on a trade or business (section 162) and nondeductible personal expenditures (section 262), the Supreme Court said: [The] characterization, as "business" or "personal," of the litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities. It does not depend on the consequences that might result to a taxpayer's income-producing property from a failure to defeat the claim * * * [United States v. Gilmore, 372 U.S. at 48.] The Supreme Court concluded that the wife's claims "stemmed entirely from the marital relationship," not *526 from income-producing activity. It stated: This is obviously so as regards the claim to more than an equal division of any community property found to exist. For any such right depended entirely on the wife's making good her charges of marital infidelity on the part of the husband. The same conclusion is no less true respecting the claim relating to the existence of community property. For no such property could have existed but for the marriage relationship. * * * [United States v. Gilmore at 51-52.] [Footnote ommitted.] In a similar case, United States v. Patrick,372 U.S. 53 (1963), the Supreme Court also applied the "origin of the claim" test. Patrick involved the deductibility of certain legal fees paid by the taxpayer-husband to his attorneys and attorneys representing his wife in connection with divorce proceedings instituted by the wife. A specified portion of these fees were for the arrangement of a stock transfer, the leasing of property, and the creation of a trust to permit the husband to maintain control of a corporate business. The Supreme Court concluded, as in Gilmore, that the wife's claims arose from the marital relationship, *527 not profit-seeking activity, and that the attorney's fees were therefore nondeductible. It said: We find no significant distinction in the fact that the legal fees for which deduction is claimed were paid for arranging a transfer of stock interests, leasing real property, and creating a trust rather than for conducting litigation. These matters were incidental to litigation brought by respondent's wife, whose claims arising from respondent's personal and family life were the origin of the property arrangements. The property settlement agreement itself recited that it settled rights "growing out of the marital relationship," supra, p. 55, and both courts below found that, although nominally an agreement for the purchase of the wife's property, it served ultimately to protect respondent's income-producing property from an assertion of his wife's latent marital rights. It would be unsound to make deductibility turn on the nature of the measures taken to forestall a claim rather than the source of the claim itself.[United States v. Patrick,372 U.S. at 57.] There can be no doubt that Robbie's claim against Woodrow arose from their personal and family life. *528 The legal and accounting fees attributable to the audit of the corporations are reconstruction of their records were incidental to the divorce action. Although these services were useful to the corporations, obviously their origin was in the divorce. They were performed to provide a valuation of the marital property. Accordingly, taking into account respondent's concessions, we find that the legal and accounting expense deductions of Wholesale and Retail for the fiscal year ended September 30, 1971, are disallowed in the amounts of $20,058 and $8,692, respectively. Dolese v. United States,605 F.2d 1146, 1152 (10th Cir. 1979). We need not consider respondent's alternative position that the fees sought to be deducted are not expenses but capital expenditures. In view of our holding that the payments are not deductible business expenses, it does not matter whether they are capital outlays. In either case they would not be deductible. United States v. Patrick,supra at 57; United States v. Gilmore,supra at 52. The fact that the legal and accounting fees are not deductible by the corporation does not automatically mean *529 that they are taxable to Woodrow. Ashby v. Commissioner,50 T.C. 409 (1968). At issue is whether the expenditures by Wholesale and Retail were for the personal benefit of their stockholder Woodrow or in discharge of his personal obligation. Dean v. Commissioner,57 T.C. 32, 40 (1971); Rushing v. Commissioner,52 T.C. 888, 893 (1969); Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 663 (1962). It is clear that the fees in question were for the benefit of Woodrow. The audit and other services were necessary for arranging a property division in connection with the divorce. If the corporations had not paid the fees, Woodrow would have had to pay them himself in order to obtain the property settlement and divorce. While Woodrow did execute notes to Wholesale for $2,000 of these fees, the record fails to show that any payments on these notes were made. For many of the same reasons set forth above in our discussion of the other advances, we conclude that Woodrow had no intention of repaying the fees to the corporations. Again, taking into account respondent's concessions, we hold that the payment in 1971 of *530 legal fees of $14,500 [12] and $2,500 by Wholesale and Retail and accounting fees of $6,750 by Wholesale are dividends taxable to Woodrow to the extent of the corporations' earnings and profits. All of these fees except $2,000 paid by Retail were paid before July 26, 1971, while Robbie still had a community property interest in the Wholesale and Retail stock. Accordingly, except for the $2,000, for reasons previously stated, Woodrow must include as income only half of the amount determined to be dividends. III. Notes Payable Deduction. The final issue arises from the Federal estate tax deduction of $338,631 claimed for notes payable to Wholesale by the Estate of Woodrow Colley. Section 2053(a) provides that in determining the value of a decedent's taxable estate, claims against the estate which are allowable by the laws of the jurisdiction under which the estate is being administered shall be deducted from the value of the gross estate. Section 20.2053-4, *531 Estate Tax Regs., provides that only claims enforceable against the estate may be deducted.
We have concluded above that Woodrow had no real intent to repay the net advances he received from Wholesale and Retail in 1970 and 1971. These advances constitute $192,357 (according to petitioners' calculations) of the $338,631 deducted on the Federal estate tax return. We have determined that in the fiscal year ended September 30, 1973, Wholesale and Retail made payments required of Woodrow under the divorce decree in the amounts of $21,648 and $66,000, respectively, and that Wholesale paid $27,048 in the previous fiscal year.There is no explanation in the record as to what advances made up the balance of the amount deducted as indebtedness. Petitioners have failed to convince us that these payments were valid loans, and the burden of proof is on petitioners.Rule 142, Tax Court Rules of Practice and Procedure. For the same reasons discussed in connection with the earlier advances, we hold that Woodrow had no obligation or intention of repaying the advances from Wholesale and Retail in the fiscal years ending in 1972 and after. Accordingly, Woodrow's estate is not entitled to a deduction *532 of $338,631. See Estate of Caplan v. Commissioner,42 T.C. 446 (1964), affd sub nom. Levin v. Commissioner,355 F.2d 987 (5th Cir. 1966). Even if we were to conclude that the Estate of Woodrow Colley did have a real obligation to pay $338,631 to Wholesale and Retail, we think it would not be entitled to a deduction for that amount. Petitioners have not proved that a claim against the estate was ever filed by the corporations, and it is plain that at least through September 30, 1977, the estate never paid the amount deducted. Section 298 of the Texas Probate Code (Vernon) provides in part as follows: Claims Against Estates of Decedents and Wards (a) Claims Against Decedent's Estate Postponed if not Presented in Six Months. All claims for money against a testator or intestate shall be presented to the executor or administrator within six months after the original grant of letters testamentary or of administration; otherwise the payment thereof shall be postponed until the claims which have been presented within six months and allowed by the executor or administrator and approved by the court have been first entirely paid; provided, however, *533 that the failure of the holder of a secured claim to present his claim within said six month period shall not cause his claim to be postponed, but it shall be treated as a claim to be paid in accordance with subsequent provisions of this Code. * * *
(c) Claims Barred by Limitation Not to Be Allowed or Approved. No claims against a decedent or ward, or against the estate of either, on which a suit is barred by a general statute of limitation applicable thereto shall be allowed by a personal representative. If allowed by the representative and the court is satisfied that limitation has run, the claim shall be disapproved. The statute of limitations, as in effect in 1975, is set forth in article 5526, Tex. Rev. Civ. Stat. Ann. (Vernon), which reads in part as follows: There shall be commenced and prosecuted within two years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description: * * *
4. Actions for debt where the indebtedness is not evidenced by a contract in writing. Since over two years has passed since Woodrow's death, no enforceable claim can be filed at this time by the corporations against *534 the estate. Petitioners have failed to prove that any claim against the estate was filed within the statutory period. Therefore, we conclude that no enforceable claim was ever made against the estate, and under the code and regulations, no estate tax deduction can be allowed. Estate of Hagmann v. Commissioner,60 T.C. 465 (1973), affd. per curiam 492 P.2d 796 (5th Cir. 1974). Petitioners contend that if we find that the estate is not entitled to the deduction, Woodrow's interest in the corporations should be revalued. The value of $850 per share which was reported on the Federal estate tax return is based on a computation which included the $338,631 as an asset of the corporations. In the light of our conclusion that that amount was not a valid obligation of Woodrow, the $338,631 should not be treated as an asset in any computation of value. Respondent's method of valuation, as set forth in the Federal estate tax audit report, is generally consistent with the method used on the Federal estate tax return. Both compute a value based on capitalized earnings of the corporations using a range of capitalization rates between 7.1 and 12.5. Respondent *535 does not dispute petitioners' next step of averaging this earnings value (given a weight of 1.5) with an adjusted book value (given a weight of 1.0). Both parties agree to a 25 percent discount of the final figures to take into account the lack of marketability of closely held stock and the key role Woodrow had played in the business. The evidence as to the value of the stock is contained in the Federal estate tax return. Based on such evidence, we conclude that at Woodrow's death the value of his interest in Wholesale and Retail was $750 per share, or $375,000 for all 500 shares. In reaching this conclusion we have employed the general method used by both the petitioners and respondent and considered all the evidence, including testimony and exhibits concerning the calamitous events of 1974 and early 1975 and the harmful effects such events would have had on the lumber businesses. To reflect the issues abandoned and conceded by the parties and our conclusions with respect to the disputed issues, Decisions will be entered under Rule 155. Footnotes
1. Mrs. Robbie Colley, who filed a joint Federal income tax return with Woodrow Colley for 1970, is not party to this case.↩
2. Our decision on this issue will also resolve whether Woodrow Colley Lumber Co. is entitled to a net operating loss deduction, in excess of the amount allowed by respondent, attributable to a carryback from the taxable year ended September 30, 1971, to the one ended in 1968. Petitioners have conceded the other items which made up the disallowed portion of the 1971 net operating loss. (Except as it relates to carryback issue, the return of Woodrow Colley Lumber Co. for the fiscal year ended in 1971 is not otherwise in issue.)↩
*. The record does not permit more specific identification of this item.↩
*. Once again the record does not permit more specific identification of these items.↩
*. It appears that Woodrow made additional contributions in this amount which were charged to "notes payable" rather than credited to "accounts receivable-officers."↩
3. It appears that at some point in time Retail became a wholly owned subsidiary of Wholesale, although the record does not establish when.↩
*. Includes "Loans to Officers."↩
*. Includes "Loans to Officers" at full value ($338,630.55) and written down "Notes Receivable" and "Investment Property."↩
4. Our resolution of other issues in this case will affect the amount of earnings and profits of Wholesale and Retail. In the Rule 155 computation herein the parties will be permitted to submit computations of earnings and profits in accordance with this opinion.↩
5. Petitioners' contention that the amounts advanced were loans by the lumber companies to Woodrow is not supported by the record. In fact, the notes from Enterprises to Wholesale and Retail undercut this position.↩
6. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise provided.↩
*. Some time in year ended 9-30-71.↩
7. Notes were executed by Woodrow on behalf of Triangle to Wholesale and Retail for advances related to the purchase of Triangle. Woodrow also executed two notes in the amount of $1,000 each of Retail for Mr. Beard's attorney's fees. The issue of legal and accounting fees will be treated separately later in this opinion.↩
8. See McDowell v. commissioner, T.C. Memo. 1974-72↩.
9. Since we have concluded that Woodrow had no intent to repay at the time the advance were made, and since this lack of intent is determinative, it would seem to make to difference that subsequent repayments or credits were made. See, e.g. Marcello v. Commissioner, T.C. Memo. 1969-193, affd. on this issue 450 F.2d 850 (5th Cir. 1971). However, in many cases courts have approved taxation of only the shareholder's net withdrawals as dividends. See, e.g. Farenga v. Commissioner, T.C. Memo. 1955-279. See generally J. Lee, "Shareholder Withdrawal--Loan or Dividend: Repayments, Estoppel and Other Anomalies," 12 Wm. & Mary L. Rev. 512, 529, etseq↩. (1971).
10. The situation in the instant case is similar to that in House of Carpets, Inc. v. Commissioner, T.C. Memo. 1973-263↩, where corporate assets were transferred to a shareholder's wife in partial satisfaction of the husband's obligation under a community property division. Although the wife executed, in connection with the property settlement, an assignment of all her stock to the husband, we found that no stock had ever been issued to her. "The fact that as between themselves, Betty may have had a community interest in William's stock did not make any of the stock hers so far as the corporations were concerned." This Court held, contrary to petitioners' claim, that the payments to the wife were not made in redemption of her stock, but were distributions taxable as dividends to the husband.
11. The "origin of the claim" test was reaffirmed by the Supreme Court in Woodward v. Commissioner, 397 U.S. 572↩ (1970).
12. Enterprises later reimbursed Wholesale for $3,000 of these fees. However, since all $14,500 of Woodrow's obligation was originally satisfied by Wholesale, we will treat it as a distribution completely from Wholesale.↩