ESTATE OF ADA E. VAN HORNE, DECEASED, ROBERT L. FARMER AND RICHARD R. COLE, EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3399–80.     Filed April 26, 1982.

*Robert L. Weaver*, for the petitioners.
*Irene S. Carroll*, for the respondent.

OPINION

Raum, *Judge*: The Commissioner determined an estate tax deficiency of $448,828.66 in respect of the Estate of Ada E. Van Horne. Following several concessions by the estate (sometimes referred to as petitioner), two issues remain: (1) Whether, in valuing an undisputed claim of a life interest against the estate for purposes of the deduction under section 2053(a)(3), I.R.C. 1954, the Commissioner properly disregarded the actuarial tables in order to give effect to the claimant's unexpected early death subsequent to the date of the decedent's death, and (2) whether certain stock in the gross estate should be discounted for "blockage." The case has been submitted on the basis of a stipulation of facts.

Ada E. Van Horne died September 4, 1976, while domiciled in California. The estate tax return was timely filed, on June 1, 1977, with the Internal Revenue Service in Los Angeles, Calif. The executors are Robert L. Farmer, of San Marino, Calif., and Richard R. Cole, of Albuquerque, N. Mex. They elected to value the gross estate on the alternate valuation date, March 4, 1977, rather than the date of death.

At the time of her death, the decedent was obligated, pursuant to an interlocutory judgment of dissolution of marriage, to pay to her surviving ex-husband, James Van Horne, $5,000 per month for spousal support for the remainder of his life. This award of support could not be modified, and the payments were to continue regardless of either his remarriage or her death. The interlocutory judgment provided further that, in the event of her death, all payments thereafter falling due would become payable by her estate.

James filed a creditor's claim on October 29, 1976, within the statutory period prescribed therefor. The executors filed a petition on November 29, 1976, for court approval of the claim, and it was approved by order dated December 27, 1976.

At the time of his former wife's death, James was aware that he had a liver ailment as a result of excessive drinking, but he had no reason to believe that he had a terminal disease. In fact, he was examined by his regular physician a few weeks after his former wife's death, and the physician failed to note any evidence of a life-threatening condition. In March of 1977, however, James' health began to decline and on March 27, 1977, he entered a hospital. At this point, both the physician

and James were aware that James had cancer, though apparently this fact was not then disclosed to the executors. James died on April 20, 1977, having received from the estate only $35,000 in respect of his claim for spousal support.

On the estate tax return, the executors claimed a deduction of $596,386.58 for the debt to James. This amount was computed using the actuarial tables found in section 20.2031–10, Estate Tax Regs. The parties have stipulated that the amount computed is correct if use of the actuarial tables is the proper method of valuing the debt. The Government contends, however, that actuarial valuation should be disregarded here because the obligation was in fact extinguished after the payment of only $35,000.

At the time of her death, the decedent, a granddaughter of William Wrigley, Jr., owned 56,454 shares of Wm. Wrigley Jr. Co. common stock (Wrigley stock), which was listed on the New York Stock Exchange. The closing price of the stock on September 3, 1976, the day before her death, was $82.25 per share, but on March 4, 1977, the alternate valuation date, the mean market price of the stock was $73.9375 per share. On both dates, the total number of outstanding shares of Wrigley stock was approximately 3,940,000.

The executors determined that it would be necessary to liquidate a large portion of the estate's Wrigley stock in order to pay the various expenses and taxes due from the estate. To this end, advice was obtained from a representative of Morgan, Stanley & Co., Inc., a member firm of the New York Stock Exchange specializing in the trading of Wrigley stock. The advice given to the executors on or about December 17, 1976, and again to counsel for the executors on February 18, 1977, was that approximately 40,000 shares could feasibly be sold in one of the two following ways: (a) A block sale, with Morgan, Stanley as agent, at a discount from market price at time of sale of between 5 percent and 8 percent; or (b) a nonregistered secondary offering which would depress the market price by an estimated $3 per share.

On February 16, 1977, three Wrigley family members and a family trust offered to purchase certain amounts of stock, totaling 18,916 shares, at a discount of $2 per share from the then market price of $76.25 per share. Upon petition of the executors, court approval of the proposed sale was obtained on

February 18, 1977. Pursuant to the court decree, the shares were sold for $74.25 each.

On February 24, 1977, the court granted the executors the authority to sell two additional blocks of the estate's Wrigley stock at a discount of $2 per share from the market price. Philip K. Wrigley purchased 5,000 shares at $71.75 per share, and as to the second block, which consisted of 18,500 shares, an order to sell was placed with Morgan, Stanley. On February 25, 1977, Morgan, Stanley sold the shares in private placements in separate blocks of 16,000 and 2,500 shares, all at the discounted price of $71 per share.

As a result of these dispositions, the estate held only 14,038 shares of Wrigley stock on March 4, 1977, the alternate valuation date. As stated above, the mean market price of the stock on that date was $73.9375 per share. Set forth below is the range of prices and trading volumes for the approximately 4-month period surrounding the alternate valuation date:

| 1977 | MARKET PRICE RANGE | | | |
|---|---|---|---|---|
| Week ending— | High | Low | Close | Volume (000) |
| Jan. 7 | 73.500 | 72.000 | 72.375 | 3.5 |
| Jan. 14 | 73.000 | 72.250 | 73.000 | 3.7 |
| Jan. 21 | 73.750 | 71.750 | 73.750 | 3.0 |
| Jan. 28 | 77.250 | 74.250 | 77.250 | 7.1 |
| Feb. 4 | 80.000 | 76.500 | 80.000 | 5.5 |
| Feb. 11 | 80.000 | 78.500 | 78.500 | 4.8 |
| Feb. 18 | 78.000 | 73.750 | 73.750 | 9.0 |
| Feb. 25 | 73.875 | 71.000 | 71.000 | [1] 21.8 |
| Mar. 4 | 74.000 | 70.375 | 74.000 | 7.9 |
| Mar. 11 | 80.500 | 74.250 | 79.500 | 42.8 |
| Mar. 18 | 81.000 | 75.250 | 80.000 | 30.1 |
| Mar. 25 | 80.875 | 79.250 | 79.750 | 18.7 |
| Apr. 1 | 81.500 | 80.000 | 81.375 | 13.8 |
| Apr. 8 | 81.875 | 80.000 | 81.375 | 8.1 |
| Apr. 15 | 85.000 | 80.250 | 85.000 | 35.4 |
| Apr. 22 | 86.000 | 84.250 | 85.000 | 20.4 |
| Apr. 29 | 84.000 | 80.250 | 81.750 | 11.4 |

On the estate tax return, the 14,038 shares held by petitioner on March 4, 1977, were valued at $71.9375, to reflect a $2 per share discount for "blockage." The Government contends that

---

[1] This figure includes the 18,500 shares sold by the estate through Morgan, Stanley.

such a discount is inappropriate here and seeks to value the shares at the March 4, 1977, mean market price.

1. *Section 2053 deduction.*—Section 2053(a), I.R.C. 1954,[2] provides for a deduction from the gross estate for, inter alia, "claims against the estate * * * as are allowable by the laws of the jurisdiction * * * under which the estate is being administered." According to the applicable Treasury regulation, "Only claims enforceable against the decedent's estate may be deducted." Sec. 20.2053–4, Estate Tax Regs.

This case presents no issue as to whether the claim of the surviving ex-husband was either "allowable" or "enforceable"; it is clear that the claim was timely submitted and subsequently approved by the State court with jurisdiction over the estate. Instead, we are concerned here with valuation of the claim. The Government contends that a deduction of only $35,000 is permissible, because this was the amount actually paid by petitioner before the obligation was extinguished by James' death. Petitioner claims a deduction for the actuarial value of the debt as of the date of the wife's death ($596,386.58), arguing that events occurring subsequent to her death may not be taken into account to arrive at a different value.[3]

The petitioner finds support for its position in *Estate of Lester v. Commissioner*, 57 T.C. 503, 507 (1972), which, like the present case, involved an obligation to make periodic payments pursuant to a divorce decree. The decedent in *Estate of Lester* was ordered to pay $1,000 per month to his former wife

---

[2]SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

*　　　*　　　*　　　*　　　*　　　*　　　*

(3) for claims against the estate, * * *

*　　　*　　　*　　　*　　　*　　　*　　　*

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

[3]Because the parties have stipulated as to the proper actuarial value of the debt, which they computed as of the date of death, we are not presented with the issue of whether a claim against the estate should be valued as of the alternate valuation date, rather than the date of death, when the election is made under sec. 2032, I.R.C. 1954, to value the gross estate on the alternate date. We note in passing the apparent absence of illumination on this point in the regulations and the case law. However, sec. 2032 is concerned with the valuation of the *gross* estate, and does not involve *deductions* except for a few special situations which plainly do not include deductions of the kind involved herein.

until her death or the expiration of 130 months, whichever event should first occur. The divorce decree required that the decedent's estate continue the payments, which it did beginning with his death at a time when 111 installments remained unpaid. After making 10 payments, the estate substituted a commercial annuity for the remaining obligation, and sought to deduct, under one of its alternative contentions, the sum of the payments made and its cost for the annuity. The Government's position, contrary to the one taken here, was summarized as follows (57 T.C. at 506):

The Commissioner contends that the amount of the estate's obligation to the decedent's ex-wife is the commuted value at the date of death of the installments which had not yet become due. He cites *Ithaca Trust Co. v. United States*, 279 U.S. 151 (1929), as authority. Thus we are referred to section 20.2031–7(a)(1) and (2) and in turn to section 20.2031–7(e), Estate Tax Regs., the latter of which gives instructions concerning the valuation of an interest, an annuity in this case, which "is dependent * * * upon a term certain concurrent with one * * * " life. * * *

We sustained the Government, holding that the general principle of *Ithaca Trust Co. v. United States*, 279 U.S. 151, 155 (1929), discussed hereinafter—that so far as is possible, valuation is determined as of the date of death by the use of actuarial tables[4] —must apply, and we said (57 T.C. at 507):

The use of actuarial tables such as those found in section 20.2031–7, Estate Tax Regs., to ascertain the value of such a claim, especially when it is periodic in nature, has been the administrative and judicial norm for many years. *Estate of Pompeo M. Maresi*, 6 T.C. 582, 586 (1946), affirmed sub nom. *Commissioner v. Maresi*, 156 F.2d 929 (C.A. 2, 1946); *Estate of Francis Browne Grinnell*, 44 B.T.A. 1286, 1288 (1941), modified sub nom. *Commissioner v. State Street T. Co.*, 128 F.2d 618 (C.A. 1, 1942); *Estate of Reginald L. Taylor*, 39 T.C. 371, 374 (1962), affirmed sub nom. *Gowetz v. Commissioner*, 320 F.2d 874 (C.A. 1, 1963); Rev. Rul. 67–304, 1967–2 C.B. 224.

The Government offers no explanation for its conflicting positions in *Estate of Lester* and the instant case; instead, it seeks to distinguish *Estate of Lester* factually, and it contends that other cases, like *Estate of Thompson v. Commissioner*, 74 T.C. 858 (1980); *Estate of Courtney v. Commissioner*, 62 T.C. 317 (1974); and *Estate of Hagmann v. Commissioner*, 60 T.C. 465 (1973), affd. 492 F.2d 796 (5th Cir. 1974), are all closer on point

---

[4]See p. 737 *infra*.

than *Estate of Lester.* We do not agree. The Government's argument is flawed, for it fails to distinguish between the *enforceability* of the claim, which was the issue presented in the foregoing cases, and the *valuation* of an enforceable claim, which is the issue common to *Estate of Lester* and the case at bar. Stated somewhat differently, the so-called claims in those cases were only potential, unmatured, contingent, or contested claims at the date of death, and it became necessary to consider post-death events to determine whether or to what extent such "claims" actually ripened into enforceable claims that could be deducted at all.

Before undertaking an analysis of these cases, it is important to begin with a close examination of the Supreme Court's opinion in *Ithaca Trust Co. v. United States,* 279 U.S. 151 (1929), which was relied upon in *Estate of Lester* and which was distinguished or ignored in the cases urged upon us by the Government. In *Ithaca Trust,* the decedent bequeathed his residuary estate in trust to his wife for life,[5] with remainder to charitable donees. In order to determine the amount of the charitable deduction, it was necessary first to fix a value for the widow's life estate, which would then be subtracted from the principal to arrive at the amount of the deductible charitable remainder. Cf. *Estate of Boeshore v. Commissioner,* 78 T.C. 523, 532–533 (1982). The estate's claimed deduction was based on a valuation of the life estate computed actuarially as of the date of the testator's death. However, the widow in fact died within 6 months, long before the expiration of her life expectancy and even prior to the lapse of the 1 year fixed by the applicable Revenue Act of 1918 for filing the estate tax return. In holding that the computation must be based on the actuarial tables rather than on the precise known time of the widow's subsequent death, the Court stated (279 U.S. at 154–155):

> The second question is raised by the accident of the widow having died within the year granted by the statute, § 404, and regulations, for filing the return showing the deductions allowed by § 403, the value of the net estate

---

[5]He also authorized invasion of the principal for any sum "that may be necessary to suitably maintain her in as much comfort as she now enjoys." The Court held the power to invade was limited by a standard that was fixed in fact, and since the income was more than sufficient to maintain the widow as required, her life interest could be valued without taking that power into account. *Ithaca Trust Co. v. United States,* 279 U.S. 151, 154 (1929).

and the tax paid or payable thereon. By § 403(a)(3) the net estate taxed is ascertained by deducting, among other things, gifts to charity such as were made in this case. But as those gifts were subject to the life estate of the widow, of course their value was diminished by the postponement that would last while the widow lived. The question is whether the amount of the diminution, that is, the length of the postponement, is to be determined by the event as it turned out, of the widow's death within six months, or by mortality tables showing the probabilities as they stood on the day when the testator died. The first impression is that it is absurd to resort to statistical probabilities when you know the fact. But this is due to inaccurate thinking. The estate so far as may be is settled as of the date of the testator's death. * * * The tax is on the act of the testator not on the receipt of property by the legatees. * * * Therefore the value of the thing to be taxed must be estimated as of the time when the act is done. But the value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market. * * * Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future; and the value is no less real at that time if later the prophecy turns out false than when it comes out true. * * * Tempting as it is to correct uncertain probabilities by the now certain fact, we are of opinion that it cannot be done, but that the value of the wife's life interest must be estimated by the mortality tables. Our opinion is not changed by the necessary exceptions to the general rule specifically made by the Act.

The application of the foregoing principle to the facts of this case plainly requires that the value of James' life interest be computed actuarially as of the date of the decedent's death and not on the basis of his unexpected death 7 months thereafter. Cf. *Simmons v. United States*, 667 F.2d 832, 834 (9th Cir. 1982).

Unfortunately, much confusion and diversity of views have arisen since *Ithaca Trust* as a result of overly simplistic attempts to formulate a rule that post-death events can never be taken into account, and *Ithaca Trust* has been distinguished in certain situations. Thus, it became necessary to consider post-death events in cases involving deductions for debts of the decedent where the creditor had only a potential, unmatured, contingent, or contested claim that required further action or clarification before it became a fixed obligation of the estate that was payable under applicable State law. The *Thompson, Courtney,* and *Hagmann* cases referred to above are typical of such cases.

In *Estate of Thompson v. Commissioner, supra,* post-death events were examined only to determine the enforceability of a claim against the estate. The petitioner in *Thompson* argued

that an oral compromise in respect of a claim had been made during the Indiana statutory period for filing claims. Since "the validity of the claim, and, thus, its deductibility" must be determined under State law, it was necessary to consider the effectiveness of the post-death event—the oral compromise—in establishing the claim under Indiana law. 74 T.C. at 861.

In *Estate of Courtney v. Commissioner, supra,* both the decedent and his wife were liable on the note in question. Since the wife had made all of the post-death payments, no claim for payment had been presented to the estate. After noting the lack of evidence showing that the estate would ever make payment on the note, we said (62 T.C. at 323):

What we have here is simply an *unmatured, potential* claim without an existing claimant. We think Congress did not have this situation in mind when it provided for the allowance of deductible claims under section 2053(a)(3) from the value of a decedent's gross estate. Accordingly, we hold that the petitioners are not entitled to a deduction for a debt owed by the estate *where the creditor does not enforce its claim against the estate.* * * * [Emphasis supplied.]

*Estate of Hagmann v. Commissioner, supra,* the final case in the foregoing triad, is also distinguishable in that it deals with enforceability rather than valuation. There, under applicable Florida law, a debt became void if no claim was filed against a decedent's estate within 6 months of publication of notice to creditors. Accordingly, since no claim was timely filed in *Hagmann,* the potential obligation never became enforceable, and it was held to be nondeductible. We were careful to point out in distinguishing *Ithaca Trust* that post-death evidence may appropriately be considered "when it relate[s] to the enforceability of" the claimed deduction.[6] 60 T.C. at 467.

To be sure, all of the cases in this field dealing with post-

---

[6]By requiring that the claim be enforceable, the Treasury regulation (sec. 20.2053–4, Estate Tax Regs.) imposes the burden upon the estate of showing that all events necessary for a potential claim to become an existing and effective claim have occurred. It was in determining whether or not such a showing had been made that we looked, in *Estate of Hagmann,* to events occurring subsequent to death, for it is only after death that a claim against the decedent can become a binding obligation of the estate. If, as was the case in *Estate of Hagmann,* a prerequisite for maturation of a potential claim is never fulfilled, then at no time is the estate obligated to satisfy the claim. On the other hand, when all events have occurred such that the estate is liable for the debt under State law, then all of the requirements for deductibility have been met. This eliminates the need to broaden the scope of observation to encompass events subsequent to death, and the *Ithaca Trust* principle of valuation as of the date of death must apply.

death evidence are not easily reconciled with one another, and at times it is like picking one's way through a minefield in seeking to find a completely consistent course of decision in this area. However, subsequent cases which have relied upon *Estate of Hagmann* have generally done so for the proposition that events occurring after death may be considered when they shed light on the *enforceability* of the claim. See, e.g., *Estate of Greenberg v. Commissioner*, 76 T.C. 680, 684 (1981); *Estate of Colley v. Commissioner*, a Memorandum Opinion of this Court (40 T.C.M. 81, 96, 49 P-H Memo T.C. par. 80,107 (1980)); *Estate of Silvester v. Commissioner*, a Memorandum Opinion of this Court (36 T.C.M. 1815, 1820, 46 P-H Memo T.C. par. 77,439 (1977)); *Estate of Gosch v. Commissioner*, a Memorandum Opinion of this Court (35 T.C.M. 353, 354, 45 P-H Memo T.C. par. 76,082 (1976));[7] but see *Estate of Scofield v. Commissioner*, a Memorandum Opinion of this Court (41 T.C.M. 227, 233, 49 P-H Memo T.C. par. 80,470 (1980)).

While there may well be a valid basis for distinguishing *Ithaca Trust* in cases involving potential, unmatured, contingent, or contested claims, we can find no tenable distinction between this case and *Ithaca Trust*. Both involve the *valuation* of a life estate as of the date of death of a decedent. To be sure, the life estate in *Ithaca Trust* was valued for the purpose of determining the amount of deduction allocable to the remainder, while the life estate here is being valued for the purpose of determining the amount of deduction attributable to the life estate itself. The problem presented involves identical considerations, and it would require a quixotic reading of the opinion in *Ithaca Trust* to conclude that it is not applicable here. It is one thing to distinguish *Ithaca Trust* in cases involving enforceability of a claimed debt, but to distinguish it here would be to distinguish it to the point of extinction. It is not the function of this Court, a lower court, to overrule the Supreme Court. Cf. *United States v. Mason*, 412 U.S. 391, 396 (1973). If a different result is thought to be more desirable, the

---

[7] We employed somewhat similar reasoning in distinguishing *Ithaca Trust* in *Estate of Mary Redding Shedd v. Commissioner*, 37 T.C. 394 (1961), affd. 320 F.2d 638 (9th Cir. 1963), where the claim pending at the decedent's death was subject to a contingency the resolution of which was deemed critical in determining the deduction from the gross estate.

proper course is to await reversal by the Supreme Court itself or a legislative modification of the controlling statute.

A troublesome case in this field is *Commissioner v. Shively's Estate*, 276 F.2d 372 (2d Cir. 1960), decided by a divided panel of the Second Circuit, reversing a Memorandum Opinion of this Court (17 T.C.M. 965, 27 P-H Memo T.C. par. 58,196 (1958)). That case did involve a comparable, but not identical problem to that presented by the instant case. There, the obligation to make periodic payments to the surviving spouse was to continue for the life of that spouse or until remarriage. The surviving spouse in fact remarried less than 1 year after the decedent's death, and prior to the filing of the estate tax return. In holding that the amount deductible must be limited to the payments actually made, the majority placed weight on the fact that under the applicable Connecticut law, the surviving spouse's provable claim would have been limited to the payments due prior to remarriage. 276 F.2d at 374. No such circumstance is present here, where James' claim to payments for the remainder of his life was approved by the California court, and there is no contention that the claim would be limited under local law by post-death events. The majority also relied heavily upon the fact that the remarriage occurred prior to the filing of the estate tax return. 276 F.2d at 375.[8] However, in the *Ithaca Trust* case, the Supreme Court made clear that the occurrence of the death of the life beneficiary prior to the due date of the return was wholly irrelevant. 279 U.S. at 154. This was pointed out in the dissenting opinion of Judge Moore (276 F.2d at 376), and it is at least questionable whether the *Shively's Estate* majority opinion would be followed in this respect today by the Second

---

[8]See also *Estate of Chesterton v. United States*, 213 Ct. Cl. 345, 551 F.2d 278 (1977), where the remarriage of the surviving spouse prior to the filing of the estate tax return was similarly stressed. In *Estate of Chesterton*, the court grounded its opinion to some extent on the *enforceability* line of cases typified by *Estate of Hagmann*. As we have already pointed out in great detail, these cases are distinguishable from the instant case and *Ithaca Trust*, which involve only *valuation* of a claim. Another possible distinction between *Estate of Chesterton* (as well as *Shively's Estate*) and *Ithaca Trust* is that the payments in the former cases were subject to termination by a wholly volitional act, namely, remarriage; no consideration appears to have been given to whether there existed reliable statistical tables dealing with the likelihood of remarriage in contrast to the generally accepted mortality tables, which are deemed actuarially sound and are relied upon in computing the value of a life estate. Cf. *Humes v. United States*, 276 U.S. 487, 493 (1928); *Commissioner v. Maresi*, 156 F.2d 929, 931 (2d Cir. 1946), affg. 6 T.C. 582 (1946).

Circuit. In any event, in view of the perceived status of Connecticut law, in contrast to California law involved herein, *Shively's Estate* is not controlling here. We note that *Estate of Lester*, upon which we rely here, was decided some 12 years after *Shively's Estate.*

We hold that James Van Horne's claim against petitioner must be valued actuarially as of the date of Ada Van Horne's death. This holding is in accord with the unanimous opinion of the Supreme Court in *Ithaca Trust*. It also follows our opinion in *Estate of Lester* and is compatible with the line of cases represented by *Estate of Hagmann.* [9]

2. *"Blockage" discount.*—At Ada Van Horne's death, her estate contained 56,454 shares of Wrigley stock; at the alternate valuation date, March 4, 1977, only 14,038 shares remained. The dispute here concerns only the shares still in the estate at the alternate valuation date, for it is clear that the value of the shares sold is fixed as of the date of sale. Sec. 2032(a)(1). As a preliminary matter, petitioner contends that, for purposes of determining whether a blockage discount is appropriate for the retained shares, we should consider the relevant block to be all of the shares held at the date of death. Stated differently, petitioner takes the position that the interim sales of 42,416 shares should not diminish the original block of 56,454 shares, even though such sales establish the value of the shares sold. It is the Government's contention that the shares sold prior to the alternate valuation date cannot be considered in valuing the retained shares; in addition, the Government asserts that the value of the 14,038 shares held by the estate on March 4, 1977, was the mean market value without diminution for a blockage discount. We agree with the Government on both counts.

(a) A simple examination of section 2032(a), the applicable

---

[9] Given our determination that valuation of this claim is to be made as of the date of the former wife's death, we have no doubt that this is an appropriate case for use of the actuarial tables. Despite the fact that James Van Horne's death occurred only some 7 months after her death, his death was not anticipated to be imminent in September of 1976 (in fact his fatal ailment was then undiagnosed), and thus, the tables must be used to value the annuity. See *Miami Beach First Nat'l Bank v. United States*, 443 F.2d 116, 120 (5th Cir. 1971); *Estate of Hoelzel v. Commissioner*, 28 T.C. 384, 389 (1957); Rev. Rul. 80–80, 1980–1 C.B. 194.

provisions of which follow, reveals the fatal weakness of petitioner's argument as to the relevant block for valuation:

SEC. 2032. ALTERNATE VALUATION.

(a) GENERAL.—The value of the gross estate may be determined, if the executor so elects, by valuing all the property included in the gross estate as follows:

(1) In the case of property distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date of distribution, sale, exchange, or other disposition.

(2) In the case of property not distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date 6 months after the decedent's death.

As indicated above, subsection (a)(1) provides the rule for valuation of 42,416 shares sold prior to March 4, 1977. Subsection (a)(2), covering "property not distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death," by definition applies only to property remaining in the estate at the alternate valuation date. The rule of valuation expressed in subsection (a)(2), that "such property shall be valued as of the date 6 months after the decedent's death," can therefore apply only to the 14,038 shares still in the estate. We reject petitioner's reading of this statute, which would value the 14,038 shares as though there were 56,454 shares in the estate on March 4, 1977, and we hold that the relevant block of stock for determining the appropriateness of a discount here is 14,038 shares.[10]

(b) The starting point for consideration of a blockage discount in valuing shares in the gross estate is section 20.2031–2(e), Estate Tax Regs., which provides, in part, as follows:

(e) Where selling prices or bid and asked prices do not reflect fair market value. If it is established that the value of any bond or share of stock determined on the basis of selling or bid and asked prices as provided under paragraphs (b), (c), and (d) of this section does not reflect the fair market value thereof, then some reasonable modification of that basis or other relevant facts and elements of value are considered in determining the fair

---

[10]The unsoundness of petitioner's position may be illustrated by the following example. Suppose that the estate had sold all of the 56,454 shares except 10 shares prior to the alternate valuation date. In accordance with petitioner's theory, the remaining 10 shares would be entitled to a blockage discount as of the alternate valuation date. We would thus have the bizarre result of valuing the 56,444 shares sold at their actual sales price and of valuing the remaining 10 shares on the basis of blockage.

market value. Where sales at or near the date of death are few or of a sporadic nature, such sales alone may not indicate fair market value. In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. *If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations.* * * * [Emphasis supplied.]

The analytical framework set out by this regulation is that, as a threshold requirement for consideration of evidence of the price at which shares could be sold outside the usual market, it must be shown that actual sales on the market, at or near the date of death, are not representative of the value of the stock held because of the disproportion between the volume of market sales and the block of stock to be valued.

Between January 7, 1977, and March 4, 1977, the alternate valuation date, the average weekly trading volume of Wrigley stock (excluding the 18,500 shares sold through Morgan, Stanley) was 5,311.11 shares, and during this period, the closing price of the stock rose $1.625. In the following 8 weeks, the average trading volume was 22,587.5 shares, and the closing stock price reflected a further increase of $7.75 a share. In the face of this evidence, petitioner asks us to draw the conclusion that it could not dispose of 14,038 shares "in a reasonable time without depressing the market." Sec. 20.2031–2(e), Estate Tax Regs. We fail to see any merit in such a conclusion, for it seems apparent that in just the 4 weeks following March 4, 1977, a period during which 105,400 shares were traded while the market value rose $7.375 per share, petitioner could have sold all of its remaining Wrigley stock, at least in stages, without any significant depressing effect on the market price, and certainly at an average price that would not have been less than the median March 4, 1977, market price of the stock.

Petitioner has failed to show that the market price of the stock on March 4, 1977, was an inaccurate reflection of the true value of the block of 14,038 shares held by it on that day. True, it has shown that the estate made private sales of 42,416 shares prior to that time at a $2 discount and that it had

received advice from Morgan, Stanley prior to the alternate valuation date in respect of a sale of a block of 40,000 shares. But the record reveals that although the market was rather thin for the period preceding March 4, 1977, there was a substantial increase in volume accompanied by higher prices immediately thereafter. In valuing a block of stock, we are not required to assume that the entire block was dumped on the market at one time on the valuation date. Rather, the inquiry must be directed to the effect upon the market based on the assumption that the block was being fed out into the market during a reasonable period of time. And in view of the evidence of a strong, rising market beginning with the week immediately following the alternate valuation date, the conclusion is compelling that the 14,038 shares could have been sold in smaller amounts over a comparatively brief period of, at most, several weeks without depressing the market below the market price for the stock on March 4, 1977. In the circumstances, we find no basis for rejecting the Commissioner's refusal to approve a blockage discount for the 14,038 shares. We hold that the Commissioner's determination of a value of $73.9375 per share must be sustained.

To reflect the foregoing, as well as to give effect to certain concessions made by petitioner,

*Decision will be entered under Rule 155.*