ESTATE OF MARY L. LUCCOCK LIVERMORE, DECEASED, PLAINS NATIONAL BANK, INDEPENDENT EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Livermore v. Commissioner
Docket No. 30801-86.
United States Tax Court
T.C. Memo 1988-503; 1988 Tax Ct. Memo LEXIS 535; 56 T.C.M. (CCH) 525; T.C.M. (RIA) 88503; October 19, 1988. Clarence P. Brazill, Jr., for the petitioner. Henry C. Griego, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: This case involves a deficiency in Federal estate tax in the amount of $ 776,441. As a result of concessions by the parties, the only issue remaining for decision is the fair market value of a one-half working interest in the Effie Dunn oil and gas lease covering property in Garza County, Texas. For the sake of convenience, we shall combine our Findings of Fact with our Opinion. Mary L. Luccock Livermore (hereinafter decedent) owned at the date of her death on August 26, 1982, 50-percent of the working interest in the 183.6-acre Effie Dunn oil and gas lease (sometimes hereinafter the lease). The Plains National Bank *536 of Lubbock, Texas, qualified as independent executor of her estate and filed a Federal Estate Tax Return reporting her interest in the lease at a value of $ 871,345. As a result of an examination of the return, respondent determined that decedent's interest in the lease had a fair market value of $ 1,168,062 at her death. Respondent now contends that decedent's interest should, in fact, be valued at $ 1,243,204. Under section 2031, [1] a decedent's gross estate includes the date-of-death valuation of all of his or her property unless an alternate value date is elected. Decedent's estate did not elect an alternate valuation date. Thus the issue to be resolved is the value of decedent's interest in the lease on August 26, 1982. Value in the context of section 2031 is fair market value. Sec. 20.2031-1(b), Estate Tax Regs. in general terms, the fair market value of property is the price *537 at which a willing buyer will purchase the property and a willing seller will sell it when neither the buyer nor the seller is acting under compulsion and both are reasonably informed of the relevant facts and circumstances. Sec. 20.2031-1(b), Estate Tax Regs; Chiu v. Commissioner,84 T.C. 722, 730 (1985). The finding of fair market value may take into account events occurring subsequent to the valuation date only to the extent that such events were reasonably foreseeable on the valuation date -- in estate tax cases, the date of decedent's death. First Nat. Bank of Kenosha v. United States,763 F.2d 891, 894 (7th Cir. 1985); Estate of Van Horne v. Commissioner,720 F.2d 1114, 1116 (9th Cir. 1983), affg. 78 T.C. 728 (1982). On the date of decedent's death, there were six producing oil wells on the lease. The first well was drilled in 1956, the next three wells were drilled in 1978 or 1979, and the last two wells were drilled in March and April 1982. The last two wells were on the downdip edge of the margin of the reservoir which produces large volumes of water as well as oil. All six wells are on 10-acre *538 spacing and are grouped in the northeast corner of the Effie Dunn lease. In late 1981, some of the wells were re-worked; this re-working temporarily increased production but substantially accelerated the rate of decline in the older wells. In arriving at the value of $ 871,345 reported in the estate tax return, petitioner relied upon a valuation report prepared by John C. Byers (Byers), an oil and gas valuation consultant who owns, and who has bought and sold, numerous oil and gas properties in the Texas area. To support this position that the lease had a value of $ 1,243,204, respondent relies upon a report by Joseph W. Yager (Yager), a petroleum engineer employed by the Internal Revenue Service. Both of those experts used basically the same method of valuation. Byers first estimated recoverable crude oil reserves at 407,145 barrels and assumed that the oil would be sold at a net price of $ 23.23 per barrel in the first year. He arrived at this net price by taking the actual price for which the crude oil was selling ($ 31.92 per barrel) at the date of death and subtracting therefrom the State severance tax ($ 1.47 per barrel) and windfall profits tax ($ 7.18 per barrel) for *539 the first 5 years. [2] He increased the net price to $ 26.71 beginning in 1990 and continuing through the later years. In computing operating expenses, Byers used the actual expenditures for the first 3 years but, for the remaining 15 years, started his computations, as of decedent's death, with an annual rate of expenditures of $ 43,000 per year. To reflect anticipated cost escalation, he increased the annual amount of expenditures by $ 1,000 per year to arrive at total operating expenses for the 18-year period. In this manner, he computed predicted future net revenue of $ 3,225,989 over the economic life of the lease. Byers then discounted the anticipated annual income at a rate of 18 percent per annum, arriving at discounted future net revenue of $ 1,452,242. He next applied a risk factor of 40 percent (i.e., reasonably anticipated realization of 60 percent) to arrive at a value of $ 871,345, consistent with the amount which he recommended (and the estate used) for reporting the value of the lease for estate tax purposes. *540 Using the same method, Yager estimated crude oil reserves at 325,426 barrels, recoverable over a 15-year period. In addition, he included estimated casinghead gas production at 147,347 MCF which could be sold beginning in 1984 at a price of 50 cents to 75 cents per MCF. For the oil, Yager estimated a net price of $ 23.27 per barrel for oil at the beginning of the period and then escalated the price annually thereafter at a rate of 6 percent per annum. He estimated gross future revenue at $ 4,047,355. As to operating expenses, Yager used a starting figure of $ 33,000 per year and increased that amount by 10 percent per year for the first 11 years and by a fixed annual amount thereafter to arrive at total expenses of $ 1,048,492 over a 15-year period. In this manner, Yager arrived at future net revenue of $ 2,998,853 which he discounted at 14 percent to arrive at a figure of $ 1,657,606 for discounted future net revenue. Yager then applied a 25-percent risk factor (i.e., reasonably anticipated realization of 75 percent) and concluded that decedent's interest in the lease had a fair market value of $ 1,243,204. We recognize the uncertainties inherent in the valuation of any property *541 on a given date. Those uncertainties are multiplied when the property is an oil and gas lease. The fair market value of such a lease is dependent on such factors as economically recoverable underground reserves, unknown future prices, future costs of operations which are dependent on uncontrollable factors, and future interest rates over the life of the lease. Exercising our best judgment in the light of all the evidence before us, we find that Byers' estimated fair market value of $ 871,345 is a reasonable one and we find that decedent's interest in the lease had a fair market value of that amount at her death. It will be observed that Byers' undiscounted future net revenue figure of $ 3,225,989 and Yager's lower figure of $ 2,998,853 are very close. They arrived at these figures by using varying estimates of recoverable reserves, product prices, and production costs. Byers estimated reserves at 407,145 barrels compared with Yager's estimate of 325,426 barrels. Byers testified, however, that in his judgment "there was only a 60 percent change that this 407,000 barrels would ever materialize." Byers' use of this larger figure for recoverable reserves is relevant to the risk factor *542 which is discussed below. As to Byers' use of an 18-year recovery period and Yager's use of a 15-year period, there is no way of predicting with any degree of certainty when operations of the wells will no longer be economically profitable. Ray J. Diekember, who has operated the lease since 1963 and who owns a one-eighth interest in the working interest in the lease, however, was called as a witness by respondent. He express the view that production would be recoverable over a 20-year period. Byers' estimate is thus between the two extremes and is reasonable. The 18-year versus a 15-year economically productive life for the lease reflects the anticipated rate of decline of production and has an important effect on value under the formula used by the experts. The following table compares the experts' estimates of production for 5, 10, and 15-year periods as a percent of the whole: Total Lease Production
Byers
Yager
First 5 years
45 percent
53 percent
First 10 years
74 percent
83 percent
First 15 years
92 percent
100 percent
Loading up the early years with a higher percentage of the anticipated production, where it is discounted less, *543 shifts income to the later years, where it is discounted the most. This shift of production to the earlier years disproportionately increases the determined fair market value under the formula used by the experts. We think it appropriate to take this factor into account in comparing the discount rates which the experts applied to the future net revenue. Yager's estimate of undiscounted future revenue of $ 2,998,853 contains two conceded errors which, if corrected, would materially reduce his estimate thereof and, consequently, his fair market value figure. First, his estimate includes anticipated revenue of $ 60,387 from the sale of casinghead gas. In his reply brief, "respondent concedes that the subject property had no anticipated revenues from gas reserves at date of death." Second, in estimating operation costs, Yager began his computations with a figure of $ 33,000 per year and escalated that figure by 10 percent per year for the first 11 years. Thereafter, he limited annual expenses to $ 125,317. Yager admitted on cross-examination that the correct cost of operations was approximately $ 43,000 rather than $ 33,000 per year at the beginning of the period and that his computations *544 properly should have begun with $ 43,000. As in the case of the use of a 15-year rather than an 18-year life for the lease, using the erroneously low cost figure for the cost of operation in the early years, bunches more net revenue in those years when the annual discount rate, discussed below, has a smaller effect and thus increases fair market value. Use of $ 43,000 rather than $ 33,000 for operating costs at the beginning of the period would have substantially reduced Yager's fair market value estimate under the formula he used. In order to convert the stream of anticipated future net revenue to the date of death value, both experts agree that a discount is necessary. On the appropriate discount rate, the parties disagree sharply. As stated above, Byers used a discount rate of 18 percent and Yager used a rate of 14 percent. Yager testified that, in determining the appropriate rate, it is customary to add one point to the prime rate, i.e., the rate of interest banks charge preferred customers. He consulted with the Republic Bank of Dallas and learned that its prime rate on August 26, 1982, was 13-1/2 percent. Because prime interest rates were de-escalating on that date, *545 he used a discount rate of 14 percent rather than the 14-1/2 percent that would have been produced by his formula. We observe that the Internal Revenue Service valuation engineer on whose report the notice of deficiency was based used a discount rate of 14-1/2 percent. To support his conclusion, Yager cited a survey published by the Society of Petroleum Engineers which showed that the prevailing rate was around 14 percent but the report refers to the rate at the end of 1982, not in August of that year. The prime rate declined between August and December 1982. Moreover, the survey showed that the discount rate charged by the banks covered by the survey at the end of 1982 ranged from 10 percent to 20 percent. In arriving at his discount rate of 18 percent in making his computations, Byers consulted the First National Bank of Lubbock and the Lubbock National Bank and was told that the prime rate fluctuated during the few months preceding decedent's death from a high of 16 to a low of 14-1/2. In August 1982, on the last posting prior to decedent's death, the prime rate was 15-1/2 percent. Under Yager's formula, this prime rate would have produced a discount rate of 16-1/2 percent. *546 To the 15-1/2 prime rate Byers added 2-1/2 points, rather than only one point, arriving at the 18-percent discount rate he used in his valuation. He made this addition of 2-1/2 points in recognition of the fact that the prime rate had been substantially higher in the period immediately prior to decedent's death. We think the 18-percent rate is somewhat high and Byers at one point in his testimony frankly admitted that it may have been "a little bit high." In the absence of other factors, we would be inclined to reduce Byers' estimate of fair market value on this ground. There are other factors, however, which we think should be taken into account in evaluating Byers's fair market value opinion. Both parties agree that there are substantial risks associated with the recovery of oil reserves. As stated, Byers used a 40-percent risk factor and Yager used a 25-percent risk factor. The first risk is, of course, how much crude oil will be produced. Applying Byers's 40-percent risk factor to his production estimate alone (60 percent of 407,145 barrels) shows a reduced production estimate of 244,287 barrels. Applying Yager's 25-percent risk factor to his production estimate (75 percent *547 of 325,426 barrels) shows an almost equal reduced production estimate of 244,070 barrels. Although the risk factor was applied by both experts to the estimated discounted future net revenue, not to the anticipated production factor alone, this point provides support for Byers' use of a 60-percent risk factor in his computations. In fixing a discount rate and in adopting a risk factor, which are not entirely unrelated, there were special considerations with respect to production which a hypothetical seller and purchaser of the lease, in our opinion, would have taken into account. About a year before decedent died, the owners of the lease re-worked the older wells. This re-working of the older wells coupled with the removal of scale from them caused a substantial increase in production but the increase in production accelerated the rate of decline. Also, the two new wells, completed in March and April 1982 initially showed substantial production but within 3 months began a precipitous decline in production. How long those declines would continue was an uncertainty which a hypothetical buyer and seller would take into account. This uncertainty in the productive capacity of the *548 lease, in our judgment, provides further justification for Byers' discount and risk factor adjustments. Another risk was what would happen to the price of oil. By the date of decedent's death on August 26, 1982, the dramatic increase in oil prices which followed the Iranian Revolution and the oil embargo had run its course and oil prices were falling. The future action of the oil-producing countries in regulating the supply of oil was conjectural. Yager's valuation assumes that the downward trend of the price, which immediately preceded decedent's death, would be reversed and that the price would rise at the rate of 6 percent per annum for a 15-year period. Byers assumed that the then current price would hold steady. We think hypothetical willing purchasers and sellers would have taken into account the oil price uncertainties existing in August 1982 in arriving at a discount of future revenue. As noted above, the discount rate reflected in the publication by the Society of Petroleum Engineers ranged as high as 20 percent at the end of 1982. This indicates that at least some banks were even more wary than Byers on the appropriate discount to be made. Finally, compared with *549 Yager's estimate of the reasonably anticipated increase of 10 percent per year in operating costs for the first 11 years, Byers' estimate that such costs would increase at a rate of only $ 1,000 per year was extremely conservative. Byers' estimated increase rate is not as great as the then annual rate of inflation. Taking into account the age of the wells and their equipment as well as the inflation rate, we think a hypothetical buyer and seller, in arriving at a discount rate and risk factor, would have taken into account the probability of higher operating costs than Byers' conservative estimate. In summary, considering all the evidence before us, we adopt Byers' opinion that decedent's interest in the lease had a fair market value of $ 871,345 at decedent's death. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
2. The difference between the $ 23.23 per barrel used by Byers' and the actual then current net price of $ 23.27 produced by these figures is insignificant. ↩